**VALENCIC, et al v. GRAND UNION COMPANY, Inc.**
No. 72-C-5266.
Circuit Court, Palm Beach County.
April 15, 1974.

Ronald V. Alvarez of Cone, Wagner, Nugent, Johnson & McKeown, West Palm Beach, for the plaintiff.

George B. Pomeroy, Fort Lauderdale, and Cecil H. Albury of Carlton, Brennan, McAliley, Albury & Hayskar, Fort Pierce, for the defendant.

LEWIS KAPNER, Circuit Judge.

Plaintiff, an eight year old girl, went to defendant's supermarket to purchase a watermelon. As she left the store to walk home, Woodrow L. Allen, a produce clerk employed by said store, somehow got the plaintiff into his car, which was parked in defendant's parking lot, drove off with her, and brutally molested her. Allen's normal work day ended at 4:30 p.m. and he had just clocked out at 4:29 p.m.

Allen has a long criminal record of brutal sexual crimes. He clearly is a person who should be confined in an institution, and if the defendant corporation had known of his record, it certainly would not have hired him. Although Allen's job was menial, it did bring him into contact with the public. Furthermore, because the store was located in a family residential neighborhood, the likelihood of contact with young children was high.

Plaintiff has sued on two counts — (1) Negligence of the corporation in hiring Allen, and (2) negligence based on the theory of respondeat superior. Defendant has filed a motion for summary judgment.

Summary judgments may be granted where there exists no genuine issue of material fact. Issues of negligence are ordinarily not susceptible of summary adjudication. This is particularly true where the facts are peculiarly within the knowledge of the movants and the showing of negligence is generally dependant upon expert testimony as to the standard of care required and observed. Lab v. Hall, 200 So.2d 556 (4th DCA 1967). The same holds true where, as here, the conduct complained of (hiring of Allen) is not such as to come within the common experience of the public.

### (I) NEGLIGENT HIRING

There are two reasons why a large grocery chain like defendant should exercise reasonable care in its hiring practices — to protect itself, and to protect the public. We are concerned here only with the latter reason.

Although Allen's job was menial, it gave him the opportunity to come into contact with the general public and with children in particular. As already noted, this particular store was located in the heart of a family residential area and the court takes judicial notice that it was not unusual for neighborhood children to shop there. Allen not only had the opportunity to see these children, but to become familiar with them by repetitive contact. Furthermore, because of the normal trust children have for employees of stores they frequent, his job gave him an additional opportunity

to commit offenses upon unsuspecting children. Therefore, defendant had a responsibility to take reasonable care in hiring employees so that someone with Allen's proclivities would not be given that opportunity.

The issue then is whether defendant's hiring practices in this case were reasonably calculated to prevent that danger.

The undisputed facts show that Allen was hired through the Florida State Employment Office. After Allen filled out an employment application, he was interviewed by defendant. Defendant corporation contacted Allen's former employers, including Molecular Research, a small electronics firm, and Pratt Whitney, a large firm doing sensitive work for the United States government. Both gave Allen a good report.

Also relevant is the fact that he allegedly was self-employed from 1964 to 1969. Defendant made no inquiry into this and sought no verification. In actuality, Allen spent this period in a mental institution because of previous sex offenses.

Allen's employement application disclosed, inter alia, the following — he was a local resident of some duration, married with two children; he owned his home, an automobile, and he carried life insurance; his wife was employed by IBM; he had never been arrested nor had he been seen by a physician within the last five years; he would not object to taking a physical examination or a lie-detector test; he completed high school and had an honorable discharge from the U. S. Army, where he held the rank of PFC.

Allen was hired in January 1971 and this incident occurred six months later. Nothing in the interval indicated that Allen had the background and propensity for harm which in fact he had.

The deposition of C. V. Stephenson, personnel advisor for Pratt Whitney, is relevant. Allen was employed there from February 23, 1961 to February 2, 1962, and he was given a good report.

Pratt Whitney is a large (5,000 employees) company which engages in sensitive work for the United States government, so a positive report from them on a former employee would be entitled to great weight in deciding whether to hire someone. (Although, it should be noted that Allen's employment with them ceased nine years prior to his employment with Grand Union.) Additionally, since Pratt Whitney must be more careful in their hiring than the average concern, their hiring practices are relevant in determining what is reasonable care. Generally speaking, most firms would not be expected to be as meticulous as is Pratt Whitney when hiring personnel.

It is the practice of Pratt Whitney to run police checks upon prospective employees. The purpose of this is described at line 12 of Stephenson's deposition — "Local situation or condition to see if the employee or prospective employee has had any serious problems that he failed to list in his application."

Grand Union conducted an apparently customary and reasonable investigation, except that plaintiff points out two alleged defects — failure to confirm the five year period of "self-employment," during which time Allen in fact was in a mental institution; and a failure to check with police or court records. Defendant claims that it is not reasonable to require them to check into a period of self-employment or police records and that Allen's criminal records would not have been available to them in any event.

Whether investigations into these sources would have been reasonably convenient and have a reasonable likelihood of results is a factual issue. Whether a company need not pursue them is a question that this court must evaluate in passing upon defendant's motion for summary judgment.

The law is clear that if an employer is chargeable with knowledge of a person's dangerous propensities, he may not then hire him and place him in a position whereby he would have an opportunity to commit those dangerous acts. M R & R Trucking Co. v. Griffin, 198 So.2d 879 (1st DCA 1967.)

In the present case, defendant placed Allen in a position where he came into contact with the public and young children and he had the opportuity to commit dangerous acts such as occurred here. Defendant therefore had a duty to take reasonable steps to assure that a person with Allen's background and propensity was not put in such a position.

Whether an investigation into a prospective employee's criminal record, or confirmation of a five-year period of self-employment is required is, even when the basic facts are undisputed, generally a factual judgment which a jury is empowered to make.

It is a relative issue, depending upon the need for such knowledge on the one hand and the difficulty or impracticality of ascertainment on the other. In this case, the jury could conclude that the need for such information existed, the means used by Grand Union to obtain it were insufficient, and the difficulty of ascertainment were slight, and that therefore the defendant was negligent.

See also 2 *Restatement of Torts*, §317 —

"A master is under a duty to exercise reasonable care so as to control his servant while acting outside the course of his employment as to prevent him from intentionally

harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them if (a) the servant . . . is upon the premises in the possession of the master . . . and (b) the master (i) knows or has reason to know he has the ability to control his servant and (ii) knows or should know of the necessity and opportunity for exercising such control."

McArthur Jersey Farm Dairy, Inc. v. Burke, 240 So.2d 198 (4th DCA 1970) held —

"[W]here, from the nature of the authorized use of property or from a course of conduct of visitors or of employees employed upon or in connection with the property, the possessor has noticed that the use of his property, by persons acting without his authority but whom he could control, may cause damage to the general public, . . . [a duty exists and it] . . . is limited to the exercise of skill and care commensurate to the danger which may reasonably be anticipated."

It is thereupon ordered that the defendant's motion for summary judgment on this count is denied.

### (II) SCOPE OF EMPLOYMENT

When did the tortious conduct begin? If we consider only the molestation, it is clear that Allen was acting outside the scope of his employment; however, if it began the moment Allen took custody of the girl, a jury could conclude that it occurred on the defendant's premises, either at or about the store itself, or on the parking lot owned by defendant. A jury could further conclude that Allen acquired physical control of the child by offering to carry her grocery bag or to accompany her home and that the girl, believing that he was carrying out his normal employment duties, and ceding to what to her was a figure of authority *because* of that employment, complied with his entreaties. If this is what happened — and for the purpose of this motion the court cannot determine conclusively that it did not — the jury could find that he was furthering his employer's purpose. It is not the secret intent of the servant that controls but his apparent intent as judged from his action. M R & R Trucking v. Griffin, supra.

If the employee's act appears to be within the scope of his employment, or if, from the nature of his employment, the employer would normally expect the employee to do the act complained of, the employer is liable. M R & R Trucking v. Griffin, supra.

Certainly the employer did not authorize Allen to commit this brutal crime upon this girl; but it cannot be said with equal certi-

tude that Grand Union did not authorize him to assist children with their purchases. If an employee in fact does do this, while in the master's employ (a jury could conclude that he was still on duty despite the fact that he clocked out immediately before he accosted the girl), and on the master's premises, a jury could find that he was within the scope of his employment and that the master is therefore liable for all the consequencies flowing from that initial act. What must be remembered under these factual conclusions that a jury may come to is that it is the employer who placed the employee in a position where he could obtain the trust of young children — like the plaintiff — who frequented defendant's store and defendant cannot then, as a matter of law, escape responsibilty if the employee abuses that trust to the injury of others.

· Defendant has cited several cases which admittedly lean in favor of defendant's position, and a word about them would be in order. First it is noted that in all the cases which went to the jury, the jury found in favor of the plaintiff, which should tell us something about the direction the trend of the law in master-servant cases should go — toward greater liability of the master for acts of the servant where, as alleged here, there is a causal connection between the master's negligence and the injury.

Secondly, when the appellate courts have sustained liability, they have connected the articulated law with the facts only by liberally applying Elmer's Glue. Does anyone really believe, e.g. that the maitre d' in Columbia by the Sea v. Petty, 157 So.2d 190 (2nd DCA 1963) bashed in plaintiff's head because of "overzealousness in the protection of what he envisioned as his employer's interest?" Does it really matter? The essential features in those cases — as alleged in this case — was that the employee was put into a position of potential harm to the plaintiff by the master, that the employee's tortious conduct began under the master's aegis and control, and that the master was negligent in so doing. In other words, there was a causal connection between the employer's negligence and the plaintiff's injury. Perhaps those cases presented a stronger factual situation than the present, but at this stage, the court cannot conclude as a matter of law that the employer is not liable.

As to those cases which reversed the jury's decisions, the courts concluded that the tortious conduct was only coincidental to the fact of employment. Riddle v. Aero Mayflower Transit Co., 73 So.2d 71 (S. Ct. 1954) said this —

> "The employee was engaged to assist in carrying on
> [the business of moving household goods], and not for
> the purpose of committing an assault upon another

*which was in no way connected* with the business of the corporate defendant." (Emphasis supplied)

Similarly, *M R & R Trucking,* supra, concluded —

"We find in the record no evidence tending to prove that the act of the employee resulting in injury to the plaintiff was committed in furtherance of the employer's interest or for its benefit. In fact, *it is hard to conceive what steps the corporate defendant could have taken to guard against an assault and battery being committed by its employee upon plaintiff or any other strikers at the chemical plant, other than the precautions it took as shown in the evidence in this case."* (Emphasis supplied)

It is thereupon ordered that defendant's motion for summary judgment as to count II is denied.